# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **CARLOS STARKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No. 1:12-cv-1008-WTL-DML** |
| | ) | |
| **LEISA MOORE, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendants' motion for summary judgment (dkt. no. 115). The motion is fully briefed, and the Court, being duly advised, **GRANTS IN PART AND DENIES IN PART** the motion for the reasons set forth below.[1]

## I.     STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court accepts as true the admissible evidence presented by the non-moving party and draws all reasonable inferences in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the

---

[1] After the Defendants filed their reply in support of their motion for summary judgment, the Plaintiff filed a Motion for Leave to file Surreply (dkt. no. 157). That motion was superseded by the Plaintiff's Corrected Motion for Leave to File Surreply (dkt. no. 159). The Defendants did not respond to either motion. The Court now **DENIES AS MOOT** Plaintiff's first motion for leave, and **GRANTS** Plaintiff's corrected motion for leave.

burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND

On July 20, 2010, Douglas Craft was shot and killed outside the Whitfield Square Apartments on the northeast side of Indianapolis. After an investigation by the Indianapolis Metropolitan Police Department ("IMPD"), Carlos Starks was arrested and charged with Craft's murder. On the second day of trial, however, the State moved to dismiss the charges against him, and the court granted the State's motion. As a result, Starks filed the instant litigation against the City of Indianapolis, the Indianapolis Department of Public Safety ("IPSD"),[2] various City officials, and the IMPD detectives he holds responsible for his wrongful arrest and subsequent incarceration. Of course, the facts leading up to Starks' arrest are somewhat disputed. Accordingly, the relevant facts of record, viewed in the light most favorable to Starks, the non-moving party, are detailed below.

### A. Craft's Murder

As Craft and his seven-year-old daughter, V.R., were walking home from the grocery store between 9:00 and 9:30 pm on July 20, 2010, Craft's ten-year-old stepson, K.R., saw them approaching and went to help with their grocery bags. As Craft and the children neared the apartment complex, K.R. saw a man step off the porch of one of the nearby apartments and approach his step-father. The children continued to walk towards their apartment while the men exchanged words. Seconds later, Craft was shot and killed.

---

[2] The parties refer to the Indianapolis Department of Public Safety as the IPSD, rather than the IDPS. Thus, the Court will also use IPSD.

About this time, two sisters, Dr. Charlene Walton and Patricia Baker, were sitting in a car parked inside the Whitfield Square apartment complex. As Baker opened the passenger door to exit Walton's car, the women heard gunshots. Baker immediately stepped back into Walton's car and shut the door. Thereafter, both women saw a man, whom they suspected was the shooter, walk away from the area where the shots were fired.

A third witness, a sixteen-year-old female named A.R., also reportedly saw the shooting unfold.

### B.  Initial Investigation and Witness Descriptions

IMPD Officer Stephanie Herr and Detectives Leisa Moore and Jose Torres, among others, responded to the scene of the murder. At some point, Detective Moore was assigned as the lead detective on the case.

While Officer Herr was securing the scene, an unidentified female told her that she saw a dark skinned black male with dreads, wearing black "Dickies,"[3] walk away after the shooting. After Officer Herr checked the grounds of the apartment complex, she left the scene to search for the shooter. As she drove by the grocery store across the street from the apartment complex, she saw Carlos Starks, who was and is a tall (approximately 6'2"), "lanky" black male with dreads wearing black Dickies waiting at a nearby bus stop. At that time, Starks was also carrying a lunch box and was wearing a black hat with goggles and a small string backpack. Officer Herr stopped and questioned Starks.

Officer Herr's account and Starks' account of what happened next differ. According to Officer Herr, she pulled over to speak with Starks at approximately 9:50 pm.

---

[3] "Dickies" is the trade name for a line of durable work-related clothing and other accessories made by Williamson-Dickie Manufacturing Company. *Dickies*, WIKIPEDIA, http://en.wikipedia.org/wiki/Dickies (last visited August 21, 2014).

> Officer Herr advised him that he matched the description of a shooting suspect believed to be in the area but did not tell Plaintiff which descriptions he matched. In response, Plaintiff stated, "he gets it all the time. It's these damn dreads. I have to cut them off."
>
> Officer Herr asked Plaintiff if he had any identification on him, which plaintiff stated he did not.[4] Officer Herr then asked Plaintiff for his name and date of birth, wrote the information down, and read it back to Plaintiff to confirm that she transcribed it accurately. Officer Herr entered Plaintiff's information into her laptop, but immediately learned that Plaintiff gave her an incorrect date of birth—an act she believed to be intentionally deceitful.[5] Officer Herr then requested backup and asked Plaintiff for his telephone number and address but she was unable to verify that the information was correct.[6]

Defs.' Br. at 9-10 (citations to the record omitted). According to Officer Herr, during the stop, she determined that Starks: "1) met the initial description of the suspect, 2) had given her a false date of birth, 3) seemed 'overwhelmingly helpful,' which in Officer Herr's experience as a police officer was suspicious, and 4) was across the street from the apartment complex where the murder had just occurred." *Id.* at 10 (citations to the record omitted). Although Officer Herr believed Starks was the shooter, she recorded Starks' information into the Computer Aided Dispatch ("CAD") system as a "person of interest" in Craft's murder and allowed him to leave the scene.

Starks, however, claims that he told Officer Herr that he had just missed the 9:27 pm bus to work (which explains his work attire, goggles, lunchbox, and backpack) when she stopped him. Thereafter, Officer Herr gave Starks a pat down, searched him, and asked for his identification. He complied with her requests and provided her with his ID. Starks also

---

[4] In her deposition, however, Officer Herr admitted that Starks did provide an ID.

[5] Officer Herr maintains that Starks told her his date of birth was 12/2/1986. Starks' actual date of birth is 12/12/1986, one number off.

[6] Officer Herr recorded Starks' address as 4436 Park Forest Court. His actual address was 4446 Park Forest Court. With regard to his phone number, there is no evidence that the phone number Starks provided to Officer Herr was false.

voluntarily told Officer Herr that the address on the ID was incorrect, and he currently lived with his girlfriend at 4446 Park Forest Court. He also gave Officer Herr his phone number. After fifteen to twenty minutes of "just sittin' there," Officer Herr and her backup officer released him and drove off. Starks' Br. at 16.

Meanwhile, at the murder scene, Detective Moore and Detective Torres obtained recorded statements from V.R. and K.R. According to V.R., the shooter was a black male with shoulder length dreadlocks and was wearing a red shirt and blue jeans. K.R. also reported that the shooter was a black male and "had a red shirt, blue jeans [and] dreads," Dkt. No. 145-17, p. 8. K.R. also told the detectives that the shooter was similar in height and weight to Detective Torres (Detective Torres identified himself as 5'10" to 5'11" and 210 pounds), and might have had a mustache. K.R. also reported that he saw the shooter enter an apartment "a couple of [apartments] down from [him]," where his friend "Nanica" lived. *Id.* at 7.

Walton also gave a recorded statement at the scene. Walton described the shooter as short (approximately 5'4" to 5'5", but no taller than 5'8") and stocky, with dreadlocks, wearing a "reddish, pinkish shirt . . . and some black shorts." Dkt. No. 145-15, p. 2.

Before leaving the scene, officers also obtained a statement from A.R. She described the shooter as a dark skinned male, in his late twenties to early thirties, with shoulder length dreads. She further stated that the shooter was wearing a red shirt with black stripes and black "Dickies" shorts. She also reported that the shooter had a "cocky" medium, muscular build and was similar in height to Detective Torres (oddly, this time Detective Torres identified himself as 6'2"). A.R. also reported that, prior to the murder, she saw the shooter driving a black Monte Carlo with red trimming, and she had seen him at the apartment complex on prior occasions.

## C.  Witness Identifications

Later that evening, Walton, Baker, and A.R. were transported to the police headquarters for additional statements. After returning to the homicide office, but before interviewing the witnesses, Detective Moore reviewed the incident history from the CAD and saw Officer Herr's notes regarding Starks. Believing Starks to be a person of interest in the case, Detective Moore prepared two six-person photo arrays, Photo Array 97483 and Photo Array 97484; 97483 included Starks' most recent booking photo. The other photos in the photo arrays were chosen because the men had features similar to Starks.

First, Detective Moore showed Photo Array 97483 to A.R. A.R. identified an individual named Robert Taylor as the shooter.

Next, Detective Moore presented Photo Array 97483 to Walton. While looking at the photo array, the following exchange occurred:

Q: And the first one I'm going to ask that you take your time looking at the photos and see if anyone of these people was the subject that you saw tonight walk by your car. Okay, alright.
A: **It could have been that guy. [Pointing to Starks.] I just saw a side. I didn't . . . I didn't see a full face just on his side.**
Q: Yeah. You got a little emotional there.
A: Yeah.
Q: Can you put your signature underneath that? And what number is that?
A: Number four.
Q: And would you please . . . this is going to be corresponding number four, our signature here and then your signature here what it says witness.
A: Okay.
Q: Okay.
A: Oh, am I supposed to sign . . . ?
Q: Your signature, yes, and where it says witness here. Okay.
Q2: What's that number, ID number?
Q: It's . . . also would you read the lineup ID number for us.
A: Okay, 97483.

Dkt. No. 145-16, pp. 5-6 (emphasis added). She did not identify anyone from Photo Array 97484.[7]

Thereafter, Detective Moore interviewed Baker. She reported that she had seen the shooter at the apartment complex on prior occasions. Additionally, after Detective Moore showed Photo Array 97483 to Baker, the following exchange took place:

> Q:    Okay. I want to show you a photo array okay?
> A:    Okay.
> Q:    Take your time Patricia. Note the time is 0255 hours.
> A:    **I'm not sure. But he sorta looked like #4. [Pointing to Starks.]**
> Q2:    Number 4.
> A:    (No verbal response.)
> Q:    What I need you to do Patricia is to put your signature under number 4 for me.
> A:    **Okay. I'm trying to view him from the side. I really didn't . . . But it kinda . . . He's more . . .** Okay. Right here?
> Q:    Uh huh (yes).
> A:    (Signature).
> Q:    And then on this sheet here, that corresponds, that's number 4, I need your signature there, and then where it says 'Witness' put your signature there as well.
> A:    (Signature). Right here?
> Q2:    Yes ma'am.
> A:    (Signature).
> Q:    And then for the record, would you recite that line for us?
> . . .
> A:    Line up ID number 97483.
> Q:    Okay.
> A:    **I'm not sure, but he's the closest.**

Dkt. No. 145-19, pp. 11-12 (emphasis added).

The following afternoon, Detective Moore interviewed K.R. and V.R. for a second time. During the interview, K.R. identified Starks from Photo Array 97483 as the person who shot his step-father. Like A.R., however, V.R. identified the shooter as Richard Taylor.

---

[7] It appears Photo Array 97484 was only shown to Walton.

**D. Statement of Vernette Robinson**

On July 29, 2010, Detective Moore interviewed Vernette Robinson, Craft's girlfriend and the mother of K.R. and V.R. She told Detective Moore that Craft had a drug debt totaling $90 that was owed to a man named "Steve" that lived in the apartment complex. She further informed Detective Moore that Craft had robbed someone at a bank to pay the debt. Robinson later identified "Steve" as Steve Williams, a black male that lived with his mom, girlfriend, and little sister "Naunica," in the apartment complex.

**E. Investigation of Steve Williams**

Detective Moore quickly ruled out Williams because he did not match the description of the shooter. Williams is a black male, medium in height, and obese, and has short hair with a receding hairline and no dreadlocks. There is no evidence regarding whether Detective Moore investigated any of Williams' acquaintances.

**F. Investigation of Richard Taylor**

Detective Moore also ruled out Taylor after reviewing his cell phone records. According to Taylor, he was at his home in his recording studio on the evening of the murder. After obtaining a search warrant for Taylor's cell phone records, officers determined that between 8:00 pm and 9:01 pm Taylor was in the area of his residence. Although the murder occurred between 9:00 and 9:30 pm, Detective Moore cleared Taylor as a suspect.

**G. Investigation and Arrest of Starks**

After speaking with Officer Herr, Detective Moore was under the impression that Starks had provided Officer Herr a false date of birth, address, and phone number. Detective Moore also reviewed the IndyGo bus schedule, and determined that no bus stopped at the bus stop where

Starks was waiting at the time he was detained on July 20, 2010.[8] According to Officer Moore, "given the three eyewitness identifications, . . . the fact Plaintiff provided false information regarding his personal identifiers and his alibi at the bus stop, and the fact she eliminated Taylor and Williams as possible suspects, Officer Moore drafted an Affidavit of Probable Cause for Plaintiff's arrest." Defs.' Br. at 18. No other detectives had any involvement in drafting the probable cause affidavit.

The probable cause affidavit described the shooting and Detective Moore's subsequent investigation. It also stated that Walton "identified Carlos Starks (photo #4) as the person she saw walking away from the" murder scene, and Baker "identified Carlos Starks (photo #4) . . . as the person she saw walking down the sidewalk away from the direction she heard gunshots." Dkt. No. 118-4, p. 2. Walton's and Baker's qualifications and hesitations regarding their identifications were not noted. Detective Moore also noted in the affidavit that Officer Herr was unable to verify "the information given by Starks." *Id.*

On September 30, 2010, Deputy Prosecutor Denise Robinson, relying solely on the information in the affidavit, concluded that there was probable cause to arrest Starks and filed an information with the court charging Starks with murder and carrying a handgun without a license. That same day, the court agreed that probable cause existed and issued a warrant for Starks' arrest. Starks was arrested on October 5, 2010, and he was incarcerated until his trial began on September 12, 2011.

---

[8] The bus schedule, however, indicates that a bus was scheduled to make a stop at the location in question at 9:27 pm, a little over twenty minutes before Starks was detained by Officer Herr. And, Starks claims he regularly rode the 9:27 pm bus to work.

### H. Starks' Trial

On the second day of trial, Baker testified on behalf of the State. After she finished testifying, Baker told Deputy Prosecutor Andrew Riedle that Starks was not the individual she saw on July 20, 2010. Thereafter, outside the presence of the jury, Walton confirmed that Starks was not the person she saw on the night of Craft's murder. Detective Moore also shared with the parties that, on the first day of trial, K.R. admitted that he did not recognize Starks as the man that murdered his father.

As a result of the foregoing, the Marion County Prosecutor's Office moved to dismiss the charges against Starks. The court granted the motion and, after almost a year in jail, Starks was released from custody.

### III.   PRELIMINARY EVIDENTIARY MATTERS

### A. Issues Related to K.R.

As discussed above, K.R., witnessed the shooting at issue in this case. Starks attempted to depose K.R. on two separate occasions; however, K.R. did not appear for either deposition. The Defendants had better luck in contacting K.R., and, in support of their motion for summary judgment, the Defendants submitted an affidavit from him. Starks has asked the Court to strike the affidavit of K.R. as a sanction for his failure to appear at his depositions. He also filed a Verified Motion for Deposition of K.R. pursuant to Federal Rule of Civil Procedure 56(d)(2) (dkt. no. 158), arguing that "if the Court determines that the Affidavit of K.R. . . . contains facts material to the outcome of Defendants' Motion for Summary Judgment," the Court should command the Defendants to make K.R. available for deposition.

The Court finds that the affidavit of K.R. does not contain statements relevant to the Court's analysis of the claims at issue in this case. Thus, the Court need not, and does not,

resolve Starks' request that the affidavit be stricken. Further, because the affidavit did not play a role in the Court's analysis, the Court also **DENIES** Starks' motion for deposition.

### B. Alleged Hearsay Evidence

In their reply, the Defendants move the Court to strike the "out-of-court statements" made by the witnesses immediately after and in the days following Craft's murder.[9] Starks argues generally that the statements contain inadmissible hearsay. The Court does not agree with Starks' sweeping argument. Indeed, as Starks argues, the statements taken during the investigation were offered "as evidence of the information IMPD gathered in the course of its investigation," and not to prove the truth of the matter asserted (i.e., that the information provided to the officers was truthful). Starks' Surreply at 3. Additionally, to the extent the statements may contain hearsay, the Court finds that the statements fall under an exception to the hearsay rule (e.g., present sense impression and/or excited utterance).

The Defendants also argue that "unsworn, taped statements taken by a homicide investigator in a criminal case should not be used in a later civil case." Def.'s Reply at 3 (citing *Butler v. Indianapolis Metro. Police Dep't*, 2009 WL 2092416 (S.D. Ind. July 13, 2009)). The Defendants' argument completely distorts the ruling in *Butler*. In that case, the plaintiff filed a motion asking the Court to find that one of the witnesses was unavailable such that he should be permitted to rely on the deposition testimony the witness gave in a separate criminal prosecution. The Court ultimately concluded that the witness was not "unavailable," and her deposition

---

[9] Specifically, the exhibits are: Exhibit 8: Starks Statement, 10-5-10; Exhibit 9: Officer Herr Statement, 7-22-10; Exhibit 10: Officer Harper Statement, 7-22-10; Exhibit 11: A.R. Statement, 7-21-10; Exhibit 12: A.R. Statement, 7-21-10; Exhibit 13: V.R. Statement, 7-20-10; Exhibit 14: V.R. Statement, 7-20-10; Exhibit 15: Walton Statement, 7-20-10; Exhibit 16: Walton Statement, 7-21-10; Exhibit 17: K.R. Statement, 7-20-10; Exhibit 18: K.R. Statement, 7-21-10; Exhibit 19: Baker Statement, 7-21-10; Exhibit 20: Robinson Statement, 7-29-10; and Exhibit 21: Taylor Statement, 7-30-10. Dkt. Nos. 145-8 – 145-21.

testimony did not fall under the prior statement hearsay exception. Simply put, *Butler* is inapplicable to the facts of the present case. Thus, the Court will not strike the statements.

### C.  Statements from Hart Case

In support of his *Monell* claims, Starks designates several statements taken by IMPD detectives during an unrelated homicide investigation. That investigation was the subject of another wrongful arrest case against the IMPD, *Hart v. Maninna*, 1:10-cv-1691-WTL-DML. Dkt. No. 145-30, Ex. D. For the purpose of this ruling, the Court considered the statements and still found that summary judgment was warranted for the Defendants on the *Monell* claims.  It need not, therefore, resolve the Defendants' objection to this evidence.

### D.  Counsel's Timeline of Events

It appears Starks' counsel prepared a timeline detailing the events of this case. Dkt. No. 145-33. Rightfully so, the Defendants move to strike the exhibit. With that said, the Court finds that the exhibit did not play a role in the Court's decision. As such, the Court need not, and does not, resolve the Defendants' request that the exhibit be stricken.

### IV.  <u>DISCUSSION</u>

Starks' complaint alleges the following constitutional claims:

| | |
|---|---|
| Count I: | Making False or Misleading Statements in Support of a Probable Cause Affidavit in Violation of the 4th and 14th Amendments to the U.S. Constitution |
| Count II: | False Arrest/False Imprisonment in Violation of the 4th and 14th Amendments to the U.S. Constitution |
| Count III: | Malicious Prosecution in Violation of the 4th and 14th Amendments to the U.S. Constitution |
| Count IV: | Abuse of Process in Violation of the 4th and 14th Amendments to the U.S. Constitution |

Count V:    Denial of Speedy Trial in Violation of the 6th and 14th Amendments to the U.S. Constitution

Starks' suit further alleges that the IMPD detectives who investigated the case (i.e., Moore and Torres) "acted under color of state law, and pursuant to the custom and/or policy of the City of Indianapolis, the IPSD, the Mayor, the Director of Public Safety, the Chief of Police and [their Supervisors at IMPD]." Compl. at ¶ 81. He also alleges that those parties tolerated and encouraged misconduct "in failing to adequately supervise, discipline, or train Defendant Detectives." *Id.* at ¶ 75. Each claim is discussed in more detail below.

As an initial matter, however, Starks notes that he does not contest summary judgment as to IMPD Supervisors William Benjamin and Kevin Kelly. Accordingly, as to Defendants Benjamin and Kelly, the Defendants' motion for summary judgment is **GRANTED**.

Second, Detective Torres moves for summary judgment on all claims against him, arguing that he is not personally liable to Starks because he was not responsible for Starks' alleged constitutional violations. In order for § 1983 liability to attach, Detective Torres must be personally responsible for Starks' constitutional deprivations. *See Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 614 (7th Cir. 2002) ("It is well-established that a plaintiff only may bring a § 1983 claim against those individuals personally responsible for the constitutional deprivation."). However, Detective Torres need not have directly participated in the alleged violations if he either "act[ed] or fail[ed] to act with a deliberate and reckless disregard of [Starks'] constitutional rights" or if "the conduct causing the constitutional deprivation occur[ed] at [his] direction or with [his] knowledge and consent." *Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir. 1986) (quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)). While Starks correctly notes that Detective Torres was involved in the initial investigation and several of the witness interviews, the Court does not agree that he was "personally involved" in the specific

actions that led to the Fourth Amendment violations alleged by Starks. Specifically, Detective

Torres had no personal involvement in the drafting or review of the probable cause affidavit.

Additionally, Detective Torres had no involvement in Starks' arrest. Accordingly, as to Detective

Torres, the Defendants' motion for summary judgment is **GRANTED**.

### A. Count I – False/Misleading Statements in Probable Cause Affidavit and Count II – False Arrest/False Imprisonment as to Detective Moore

#### 1. False/Misleading Statements in Probable Cause Affidavit

It is well-established that "[a]warrant request violates the Fourth Amendment if the

requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false

statements in requesting the warrant and the false statements were necessary to the determination

that a warrant should issue." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (quoting *Knox

v. Smith*, 342 F.3d 651, 658 (7th Cir. 2003)). According to the Seventh Circuit, "a reckless

disregard for the truth can be shown by demonstrating that the officer entertained serious doubts

as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose

facts that he or she knew would negate probable cause." *Id*. (internal quotation marks omitted).

Starks argues that Detective Moore's probable cause affidavit was false and misleading in

four respects: (1) "Det. Moore lied when she represented that Carlos had been identified by three

witnesses," Starks' Br. at 23; (2) Det. Moore lied and exaggerated when she said Carlos provided

Ofc. Herr with 'bad' information," *Id.* at 26; (3) "Det. Moore omitted material inconsistencies

between witness descriptions and Carlos' appearance," *Id.* at 29; (4) Det. Moore omitted the

consistent witness statements that the shooter lived in the Whitfield Square apartments." *Id.* at

31. The Court finds that Starks has presented sufficient facts to withstand summary judgment on

this claim.

The Defendants argue that Detective Moore did not make any false, misleading, or incomplete statements in the probable cause affidavit. Indeed, they continue to argue that both Walton and Baker *identified* Starks as the shooter. During her interview, however, Walton said, "[i]t could have been that guy. [Pointing to Starks.] I just saw a side. I didn't . . . I didn't see a full face just on his side." Dkt. No. 145-16, p. 5. Similarly, when Baker was shown the photo array, she said, "I'm not sure. But he sorta looked like #4. Pointing to Starks]," and "I'm not sure, but he's the closest." Dkt. No. 145-19, p. 11-12. To say that Walton and Baker "identified," Starks as the shooter, without noting their qualifications, could be seen by a jury as misleading, such that Detective Moore failed to disclose facts that he or she knew would negate probable cause. Thus, summary judgment is not proper on this claim.

## 2. *False Arrest/False Imprisonment*

Of course, if probable cause existed for an arrest, no Fourth Amendment violation (i.e., false arrest/false imprisonment) occurred. *See Fleming v. Livingston Cnty., Ill.*, 674 F.3d 874, 878 (7th Cir. 2012) ("Indeed, if [the Sherriff Deputy] actually did have probable cause to arrest [the plaintiff], 'then a Fourth Amendment claim for false arrest is foreclosed.'") (quoting *Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 679-80 (7th Cir. 2007)). "Probable cause exists if 'at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013) (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009)). With that said, the Seventh Circuit admits that "it does not take much to establish probable cause." *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010) (citing *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000)). While "[t]he officers

must have more than a bare suspicion that they have the right guy, [] they need not have enough

evidence to support a conviction or even to show that their belief is more likely true than false."

*Id.*

In this case, the evidence against Starks could be summarized as follows:

- Starks fit the initial description of the shooter. He was a black male, with dreadlocks, and was wearing black shorts (the same as the shooter) on the evening of July 20, 2010.

- Starks was in the vicinity of the murder scene (at a bus stop near the apartment complex) shortly after the murder was committed.

- K.R. identified Starks as the shooter out of a photo array.

- Walton and Baker thought Starks could have been the shooter.

- Detective Moore was under the impression that Starks had provided false information to Officer Herr when he was detained on the evening of July 20, 2010.[10]

- Detective Moore was under the impression that no bus stopped at the bus stop at or around the time Starks was detained.

Prior to Starks' arrest, however, there was also evidence tending to show that he was not

responsible for the murder:

- For the most part, the witnesses described the shooter as being shorter than 6'0" and having a medium build. Starks is 6'2" and "lanky."

- When Starks was detained by Officer Herr, he had a lunchbox, his work goggles, and a string backpack and claimed to be on his way to work.

- A.R. and V.R. identified Richard Taylor as the shooter.

- K.R. said he saw the shooter run to "Nanica's" apartment. The victim's girlfriend also told Detective Moore that he owed a drug debt to Williams, who lived with his little sister "Naunica."

---

[10] Starks, of course, argues that he did not give false information to Officer Herr. Regardless, of whether he provided false information or not, Officer Herr reported to Detective Moore that Starks provided false information, and it was not unreasonable for Detective Moore to have that belief.

- Other than the evidence noted above, there was no other evidence connecting Starks to Craft (i.e., no evidence that the men knew each other and no evidence of a motive).

Based on the foregoing facts, the Court finds that questions of fact remain as to whether there was probable cause to arrest Starks for Craft's murder, such that a jury should decide this issue.

### 3. Qualified Immunity

Notwithstanding the foregoing, Detective Moore argues that she is entitled to qualified immunity in relation to the foregoing claims. "Qualified immunity shields a government official from liability for civil damages unless his or her conduct violates a clearly established principle or constitutional right of which a reasonable person would have known at the time." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (citations omitted). In determining whether a defendant is entitled to qualified immunity, courts must determine: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant[] violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012).

> An officer who knowingly or recklessly submitted an affidavit containing false statements may still get qualified immunity if he can establish that he had an objectively reasonable basis for believing the facts in the affidavit were sufficient to establish probable cause. *See Malley v. Briggs,* 475 U.S. 335, 344, 106 S. Ct. 1092, 89 L.Ed.2d 271 (1986). But qualified immunity does not extend where an officer knowingly or recklessly made false statements and "no accurate information sufficient to constitute probable cause attended the false statements." *Lawson v. Veruchi,* 637 F.3d 699, 705 (7th Cir. 2011) (citation omitted).

*Betker*, 692 F.3d at 860. Reviewing the facts in the light most favorable to Starks, and as discussed above, the Court concludes that a reasonable jury could find that Detective Moore knowingly or with reckless disregard for the truth made false statements in her affidavit, without which probable cause for Starks' arrest might not have existed.

As to the second prong of the inquiry, it is clear that the constitutional right at issue (i.e., being free from an illegal arrest based on false or misleading statements in a probable cause affidavit) was clearly established at the time of the alleged violation. In this regard, "[i]n 1992, in *Juriss v. McGowan*, [the Seventh Circuit] stripped an officer of qualified immunity where only his false and misleading statements provided probable cause to arrest a woman for aiding a fugitive." *Id.* at 864 (citing *Juriss*, 957 F.2d 345, 349-50 (7th Cir. 1992)).

Based on the foregoing, Detective Moore is not entitled to qualified immunity at this stage in the litigation. Accordingly, as to Counts I and II of Starks' complaint against Detective Moore, Defendants' motion for summary judgment is **DENIED**.

### B. Malicious Prosecution

The Seventh Circuit recently held in *Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013), that individuals may bring federal malicious prosecution claims against Indiana law enforcement officers and agencies under § 1983, because Indiana has failed to provide an adequate remedy for such claims. Accordingly, "[t]o state a claim for malicious prosecution under § 1983, a plaintiff must demonstrate that: (1) he has satisfied the requirements of a state law cause of action for malicious prosecution; (2) the malicious prosecution was committed by state actors; and (3) he was deprived of liberty." *Washington v. Summerville*, 127 F.3d 552, 558-59 (7th Cir. 1997) (citations omitted). The Defendants do not address the second or third elements. Rather, they focus on the elements of malicious prosecution.

In Indiana,

[t]he elements of a malicious prosecution action are: (1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted maliciously in so doing; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor.

*Crosson v. Berry*, 829 N.E.2d 184, 189 (Ind. Ct. App. 2005) (citations omitted). The Defendants argue that Starks' claim fails because:

> 1) Probable cause existed for the prosecution of Plaintiff; 2) neither Officer Moore nor Officer Torres acted with a malicious intent; (3) even if Plaintiff was prosecuted without probable cause . . . there is no constitutional right not to be prosecuted without probable cause, absent a showing that Plaintiff was denied a specific constitutional right.

Defs.' Br. at 35.

The Court need not address the Defendants' first and second arguments, because Starks' claim fails under the third. The Defendants argue that "individuals do not have a 'federal right not to be summoned into court and prosecuted without probable cause, under either the Fourth Amendment or the Fourteenth Amendment's Procedural Due Process Clause,'" because the Fourth and Fourteenth Amendments do not protect one's interest in not being prosecuted groundlessly. Defs.' Br. at 37 (quoting *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011)); *see also Tully v. Barada*, 599 F.3d 591, 594-95 (7th Cir. 2010) ("[W]e must reach the merits of the issue . . . , which is whether a plaintiff may assert a federal right not to be summoned into court and prosecuted without probable cause, under either the Fourth Amendment or the Fourteenth Amendment's Procedural Due Process Clause. The answer is no."). Therefore, a plaintiff must "establish that he was deprived of a specific constitutional right, such as the right to a fair trial." *See Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 683 (7th Cir. 2007).

According to Starks' complaint, his claim for malicious prosecution is entirely based on the Defendants' alleged violation of the Fourth and Fourteenth Amendments due to a lack of probable cause for his arrest. Compl. at ¶¶ 88-94. He does not allege that some other

constitutional violation occurred in relation to his malicious prosecution claim.[11] Because the Fourth and Fourteen Amendments do not protect such interests, Starks' malicious prosecution claim under § 1983 is defective. Accordingly, as to Count III of Starks' complaint, Defendants' motion for summary judgment is **GRANTED**.

### C.  Abuse of Process

The Seventh Circuit has noted that "abuse of process is not a free-standing constitutional tort if state law provides a remedy." *Adams v. Rotkvich*, 325 Fed. App'x 450, 453 (7th Cir. 2009). The same was also true for claims of malicious prosecution. As noted above, however, the Seventh Circuit concluded in *Julian* that individuals may bring federal malicious prosecution claims against Indiana law enforcement officers under § 1983, because Indiana has failed to provide an adequate remedy for such claims. It appears no courts have addressed whether Indiana provides an adequate remedy in the context of an abuse of process claim. Thus, although abuse of process and malicious prosecution claims are almost identical in situations such as the one presented in this case, it is not clear whether, when applying Indiana law, an abuse of process claim against a state police officer is cognizable under § 1983. However, even assuming such a claim is permissible, Starks' claim fails nonetheless.

In Indiana, "[t]he elements of abuse of process are 1) an ulterior purpose, and 2) a willful act in the use of the process not proper in the regular conduct of the proceeding. *Lindsay v. Jenkins*, 574 N.E.2d 324, 326 (Ind. Ct. App. 1991) (citation omitted). Starks alleges that "Defendants had an ulterior purpose to close their case, and they willfully made false statements in the investigation and in the Affidavit, which was improper in the regular conduct of a homicide investigation." Starks' Br. at 37. Starks' argument, however, stops there. He designates

---

[11] Separately, Starks alleges that the Defendants violated his constitutional right to a speedy trial. As discussed below, however, that claim also fails.

no evidence showing that Detective Moore had any "ulterior purpose" in preparing the probable cause affidavit. Starks' mere allegation, with no supporting facts, is insufficient to overcome summary judgment on this claim. *See Johnson v. Cambridge*, 325 F.3d 892, 901 (7th Cir. 2003) ("As we have said before, summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (quoting *Schact v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)).

Notwithstanding the foregoing, the Court also concludes that Starks' abuse of process claim is virtually identical to and premised on the same facts and allegations as his malicious prosecution claim. As such, Starks' abuse of process claim (pursuant to the Fourth and Fourteenth Amendments) also fails for the same reasons his malicious prosecution claim fails. Accordingly, as to Count IV of Starks' complaint, Defendants' motion for summary judgment is **GRANTED**.

### D.  Speedy Trial

The Sixth Amendment guarantees an accused the right to a speedy and public trial, and Starks argues that Detective Moore violated this right. However, Starks' Sixth Amendment claim is flawed in several respects. First, as the Defendants argue, the Seventh Circuit does not recognize a denial of a speedy trial claim once charges have been dismissed:

> The defendant maintains that because he was originally indicted in February of 1980, but did not go to trial till March 22, 1982, he was denied his Sixth Amendment right to a speedy trial. This argument, however, ignores the fact that for twenty months of this period, no charges were pending against the defendant. **The Speedy Trial Clause applies only to an accused; when charges were dismissed in Iowa, the defendant lost not only the status of being an accused, he lost the Sixth Amendment's guarantee of a prompt trial. It is scarcely realistic to suppose that a citizen, free from criminal charges, wants or deserves a speedy trial. Once all counts of the indictment were dismissed, the defendant was legally and constitutionally in the same posture as though no charges had been made.**

*United States v. Samples*, 713 F.2d 298, 301 (7th Cir. 1983) (internal citations and quotations

marks omitted) (emphasis added); *see also United States v. MacDonald*, 456 U.S. 1, 8 (1982)

("Once charges are dismissed, the speedy trial guarantee is no longer applicable."). Secondly, as

the Defendants also argue, monetary damages are not available for Starks, as the typical remedy

for a Sixth Amendment speedy trial violation is dismissal of the charge. *See Barker v. Wingo*,

407 U.S. 514, 522 (1972) ("The amorphous quality of the right also leads to the unsatisfactorily

severe remedy of dismissal of the indictment when the right has been deprived . . . *Such a*

*remedy . . . is the only possible remedy*.") (emphasis added).[12] Therefore, as to Count V of

Starks' complaint, Defendants' motion for summary judgment is **GRANTED**.[13]

### G.  Claims against the City, the IPSD, and the City Officials

Finally, the Defendants argue that they are entitled to summary judgment on Starks'

*Monell* claims. To begin, the Defendants argue that Starks' official capacity claims should be

summarily denied because "a claim against a government employee in his official capacity is

treated the same as claims against the governmental unit for which he works." Defs.' Br. at 49

(citing *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008)). Because Starks has already

---

[12] The Court does not agree with Starks that *Blake v. Katter*, 693 F.2d 677 (1982) stands
for the proposition that "[t]he Seventh Circuit . . . recognized Section 1983 claims for violations
of criminal defendants' right to a speedy trial[.]" Starks' Resp. at 38.  While the Court did
reverse the district court's denial of Blake's speedy trial claim, it expressed no opinion
whatsoever regarding the possible recovery of monetary damages. It simply noted that at the
motion to dismiss stage, "no clear reason ha[d] been shown for the seventh month delay" and it
was therefore premature for the district court to dismiss the claim. *Id*. at 682.

[13] Even assuming such a claim is permissible under the facts of this case, the designated
evidence indicates that Starks requested each of the trial continuances in the criminal proceeding.
Additionally, Starks never asserted his right to a speedy trial. *See United States v. O'Connor*, 656
F.3d 630, 643 (7th Cir. 2011) ("A Sixth Amendment speedy-trial claim turns on the following
general factors: '[W]hether [the] delay before trial was uncommonly long, whether the
government or criminal defendant is more to blame for that delay, whether, in due course, the
defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's
result.'") (quoting *Doggett v. United States*, 505 U.S. 647, 651 (1992).

named the City and the IPSD as defendants, his official capacity claims are redundant and unnecessary. The official capacity claims are therefore **DISMISSED**.

Turning to the claims against the City and the IPSD, a municipality may be liable under § 1983 "if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "'Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy which policy can be attributed to a municipal policymaker.'" *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir. 1997) (quoting *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985)).

Starks maintains that "the City failed to enact or to enforce policies relating to the proper presentation of photo arrays, or failed to train officers in these manners." Starks' Br. at 42. Thus, Starks complaint sets forth both an official policy and/or custom claim and a failure to train claim. Both arguments are addressed below.

### 1. Official policy and/or custom

Starks argues that Detective Moore's photo array presentations "violated generally accepted standards of police procedure." Starks' Br. at 42. In particular, Starks argues that

> [t]he detectives failed to change the order of the lineups, despite having generated at least two arrays containing Carlos' image; failed to have an officer with no knowledge of the suspect to present the arrays (even though the interviews were conduct[ed] at the IMPD); failed to read any instructions to the witnesses, despite those instructions indicating that a witness should only sign a signature sheet if making a *positive* identification; and failed to ask the witnesses to describe their degree of certainty, unless they identified a suspect other than Carlos.

23

*Id.* at 43 (emphasis in original). More importantly, Starks argues that "the Defendants failed to adhere even to the IMPD's written policy to only have witnesses provide unqualified signatures in the event of a positive identification." *Id.* Starks further argues that the IMPD's failure to follow "these . . . procedures . . . has been occurring for years." *Id.*

Of course, most of the enumerated "standards" noted above are not standards per se, but rather, are best practices suggested by various organizations. The Court finds that Detective Moore's failure to abide by each practice was not fatal to her photo array presentations. The Court, however, takes issue with the practice of instructing witnesses to sign a photo array indicating an identification where no true *positive* identification has been made, as was done with Walton and Baker. With that said, Starks fails to designate any evidence that this practice was widespread or occurred more than once. Indeed, such a "claim requires more evidence than a single incident to establish liability." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). Starks designates several statements, which were the subject of another wrongful arrest case against the IMPD, *Hart v. Mannina*, 1:10-cv-1691-WTL-DML. Those statements, however, in no way show that this alleged practice (i.e., that individuals were instructed to sign a photo array where no true positive identification was made) has occurred on prior occasions. Accordingly, based on the designated evidence, no liability can extend to the City or the IPSD.

### 2. *Failure to train*

Starks also argues that the City and the IPSD failed to train its officer regarding the proper presentation of photo arrays. "To prevail [on a failure to train claim, a plaintiff] must show that the City's employee violated his constitutional rights, that the City had a policy or custom of failing to train its employees, and that the failure to train caused the constitutional violation." *Roach*, 111 F.3d at 549 (citation omitted). "In particular, . . . the inadequate training

of police officers could be characterized as the cause of a constitutional tort if—and only if—the failure to train amounted to 'deliberate indifference' to the rights of persons with whom the police come into contact." *Id.* (citation omitted).

The evidence in this case indicates that the IMPD did have policies in place for the presentation of photo arrays and witness identifications. In fact, the signature sheets for the photo arrays state that "[t]he person viewing the photo array lineup should sign his or her name in the box corresponding with the location of the photo that has been *positively* identified as the suspect involved in the incident." Dkt. No. 145-3, p. 2 (emphasis added). Additionally, IMPD Branch Order 1.03B further provides that "the person viewing the photo array lineup should sign his or her name in the box corresponding with the location of the photo that has been *positively* identified as the suspect in this case." Dkt. No. 145-29, p. 14 (emphasis added). These forms were regularly used by the detectives, including Detective Moore. Thus, she was aware of the *positive* identification requirement, and there is no evidence to indicate that her actions resulted from a failure to train on the part of the City or the IPSD. Additionally, and more importantly, as noted above, Starks has designated "no evidence to take this case outside the realm of an isolated incident." *Roach*, 111 F.3d at 549. Therefore, as to Starks' claims against the City and the IPSD, Defendants' motion for summary judgment is **GRANTED**.

## V. <u>CONCLUSION</u>

For the reasons set forth above, the Defendants' motion for summary judgment (dkt. no. 115) is **GRANTED IN PART AND DENIED IN PART**. For purposes of clarity, the following claims remain:

- Count I, making false or misleading statements in support of a probable cause affidavit, against Detective Moore; and

- Count II, false arrest/false imprisonment, against Detective Moore.

Additionally, the trial and final pretrial conference have been scheduled as follows: **The final pretrial conference will be held on Friday, April 3, 2015, at 1:00 pm in Room 202 of the United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana, before Judge William Lawrence; and the trial will begin on Monday, May 4, 2015, at 9:00 am in Room 202 of the United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana, before Judge William Lawrence.**

SO ORDERED:  9/02/14

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.